**2012 BNH 006**     Note:   This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.
_____

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

In re:                                                                                              Bk. No. 10-14214-JMD
                                                                                                    Chapter 11
Moultonborough Hotel Group, LLC,
              Debtor


*Deborah A. Notinger, Esq.*
*Donchess & Notinger, PC*
*Nashua, NH*
*Attorney for Debtor*

*Steven M. Notinger, Esq.*
*Donchess & Notinger, PC*
*Nashua, NH*
*Attorney for Debtor*

*William S. Gannon, Esq.*
*William S. Gannon PLLC*
*Manchester, NH*
*Attorney for ROK Builders, LLC*


## MEMORANDUM OPINION

### I.  INTRODUCTION

The Court has before it Moultonborough Hotel Group's (the "Debtor's") Second Amended Chapter 11 Plan of Reorganization (Doc. No. 206) (the "Plan").  On January 24, 2012, ROK Builders, LLC ("ROK") filed an objection to confirmation of the Plan (Doc. No. 247) (the "Objection").  On January 31, 2012, the Court held a hearing and heard oral arguments regarding confirmation of the Plan and the Objection.  Afterwards, the Court took the matters under advisement.  On February 21, 2012, the Court entered an order (Doc. No. 265) (the "Objections Order") overruling parts of ROK's objection and scheduling an evidentiary hearing on the

remaining issues. In the Objections Order, the Court narrowed the issues to (1) whether the interest rate applied to ROK's alleged secured claim is adequate to satisfy the cramdown requirements of § 1129(b) and allow for confirmation of the Plan over ROK's objection and (2) whether the estate's release of a contempt claim against Kevin Attar ("Attar") can be approved under the standards applicable to Federal Rule of Bankruptcy Procedure 9019.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II. FACTUAL BACKGROUND

On September 30, 2010, the Debtor filed for protection under chapter 11 of the Bankruptcy Code. The relationship between the parties involved has been contentious and litigious both pre- and post-petition. The Debtor's business consists of ownership of a Hampton Inn and Suites in Tilton, New Hampshire. Its assets are fully encumbered by five secured creditors. The largest secured creditor is 2010-1 SFG Ventures, LLC ("SFG"), which filed a claim of $10,622,887.83. The remaining secured creditors, ROK, GMI Asphalt ("GMI"), Stately Excavations, LLC ("Stately") and E.J. Prescott ("Prescott"), hold mechanic's liens on the Debtor's real property and filed claims totaling $2,488,829.52. From the start of the case, SFG has contended the Debtor is encumbered by SFG's valid first priority secured claim on all of the Debtor's assets. Early on, the Debtor and ROK worked together to challenge SFG's claim as a first priority secured creditor. On January 11, 2011, the Debtor filed an adversary proceeding seeking to avoid SFG's mortgage on the Debtor's real property, arguing the mortgage was not

properly acknowledged under New Hampshire law. Adv. Proc. No. 11-1001-JBH.  In the adversary proceeding, both the plaintiff and defendant filed motions for summary judgment, Doc. Nos. 22 & 24, Adv. Proc. No. 11-1001-JBH.  On May 5, 2011, Judge Haines granted SFG's motion for summary judgment and denied the Debtor's motion for summary judgment, Doc. Nos. 30 & 31, Adv. Proc. No. 11-1001-JBH.

Not only did the Debtor challenge the validity of SFG's secured claim, but ROK disputed SFG's first priority status.  Due to the priority dispute, SFG filed an adversary proceeding on March 15, 2011, Adv. Proc. No. 11-1036-JBH, seeking a determination of the extent, validity and priority of ROK's mechanic's lien.  ROK filed multiple counterclaims, one of which attempted to equitably subordinate SFG's claim, Doc. No. 15, Adv. Proc. No. 11-1036-JBH.  On August 24, 2011, SFG filed a motion for summary judgment requesting the Court hold SFG's secured claim senior to ROK's mechanic's liens, Doc. No. 62, Adv. Proc. No. 11-1036-JBH.  On September 29, 2011, Judge Haines dismissed the equitable subordination claim for lack of standing, Doc. No. 96, Adv. Proc. No. 11-1036-JBH.  The Court held a hearing on December 15, 2011, to announce its decision on the summary judgment motion.  At the hearing, Judge Haines held SFG's mortgage is fully senior to ROK's mechanic's liens to the extent of $6,434,074.40, Doc. No. 62, Adv. Proc. No. 11-1036-JBH.  Final judgment was entered in favor of plaintiff SFG on December 20, 2011, Doc. No. 137, Adv. Proc. No. 11-1036-JBH.

On December 22, 2011, ROK filed an appeal to the District Court disputing the Court's decision to grant summary judgment in favor of SFG, Doc. No. 147, Adv. Proc. No. 11-1036-JBH.  On August 30, 2012, the District Court entered an order affirming the Court's decision regarding priority of SFG's claim, Doc. No. 150, Adv. Proc. No. 11-1036-JBH.  See ROK Builders, LLC v. 2010-1 SFG Venture, LLC (In re Moultonborough Hotel Grp., LLC), 2012

DNH 148 (Aug. 30, 2012). However, the District Court also overruled ROK's objection to a clause in the Plan releasing SFG of any equitable subordination claims (the "Equitable Subordination Objection")[1] as premature because the bankruptcy court had not yet the confirmed the Plan, which included the resolution of the equitable subordination claims. Id. at *25. The District Court held the Equitable Subordination Objection must be pursued first as an objection to confirmation of the Plan with any appeal following confirmation of the Plan. On September 28, 2012, ROK filed an appeal to the U.S. Court of Appeals for the First Circuit.

After this Court held SFG has a valid mortgage on the Debtor's real property, all of the Debtor's assets were fully encumbered and it was unable to procure financing from a third party. Consequently, the Debtor began working with SFG in preparing the Plan, which was filed on November 21, 2011. The basic concept of the Plan is simple. The Debtor transfers to "SFG or its designee" all of the Debtor's real and personal property in return for full satisfaction of SFG's allowed claim, waiver of SFG's deficiency claim and payment of $150,000 to the Debtor. According to the Debtor's disclosure statement, the value of the Debtor is $6,600,000, of which $644,000 is personal property and the remainder is real estate. Effectively, due to the waiver of its deficiency claim and the cash contribution, SFG is the funder of the plan. As a result of the pending dispute regarding the priority of SFG's mortgage over ROK's mechanic's lien, the Plan provides for a scenario where ROK receives full payment of its alleged secured claim if the mechanic's lien is determined to be senior to SFG's mortgage. Accordingly, under the Plan, if

---

[1] Pages 6-7 of the Plan state: "[t]he Debtor, on behalf of itself, its estate, its successors and assigns, shall release any and all claims, causes of action, rights and/or remedies the Debtor has or had against SFG, including, without limitation, any claims, causes of action, rights and/or remedies asserted in the Adversary Proceeding and/or the Complaint and any other avoidance or other claims, including without limitation any claims or causes of action based on theories of equitable subordination."

4

SFG's mortgage is senior to ROK's mechanic's lien, ROK is wholly unsecured and would only receive its pro rata share of distribution to unsecured creditors from the bankruptcy estate. On the other hand, if ROK successfully asserts priority, ROK's mechanic's lien would be fully secured and SFG's allowed secured claim would be reduced in addition to its waiver of its deficiency claim. If deemed to be secured, ROK's alleged secured claim would be paid over seven years, with interest calculated at 3.25% and a twenty-year amortization schedule with a balloon payment due on the seventh anniversary of the effective date of the Plan. Finally, as part of the Plan, the Debtor releases Attar of an alleged contempt claim held by the estate.

Concurrently with the Plan, ROK filed a competing disclosure statement and plan of reorganization, Doc. Nos. 177 and 178, as well as an amended disclosure statement, Doc. No. 209, ("ROK DS") and amended plan of reorganization, Doc. No. 208. In the ROK DS, ROK asserted that on a liquidation basis, the Debtor is worth between $2,800,000 and $4,400,000. ROK DS at 23. Although ROK filed a proof of claim for $2,061,709.64, its disclosure statement shows ROK holds a claim for $1,634,589.00. ROK DS at 8 & ex. C. The ROK DS was fraught with issues, and on December 19, 2011, the Court entered an order denying approval of the ROK DS because it did not contain adequate information as required by Bankruptcy Code § 1125(b).

In addition to filing a competing plan and disclosure statement, ROK filed the Objection, challenging whether the Plan is confirmable. The Court heard oral arguments on the Objection and eventually issued the Objections Order, which overruled most of ROK's objections to the Plan. After entry of the Objections Order, the Court scheduled an evidentiary hearing on the two remaining ROK objections to confirmation of the Plan: (1) whether the 3.25% cramdown interest applied to ROK's alleged secured claim satisfies the requirements of § 1129(b) and allows confirmation of the Plan over the Objection and (2) whether the release of the contempt claim

5

against Attar can be approved under the standard applicable to settlements under Federal Rule of Bankruptcy Procedure 9019.

The evidentiary hearing on the remaining two issues was held on July 23, 2012. The Debtor submitted six exhibits into evidence; ROK did not submit any exhibits. The parties agreed Debtor's Exhibit 1 was an accurate reflection of the current prime rate of 3.25%. The Debtor called attorney Steve Notinger, its lead counsel, to testify on the appropriateness of the cramdown interest rate applied to ROK's alleged security interest. Attorney Notinger was not qualified as an expert on hotel financing or debtor-in-possession lending. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993). Thus, Attorney Notinger's testimony was limited to the Debtor's reasoning for choosing a cramdown interest rate of 3.25%. The crux of the Debtor's reasoning was that ROK had almost no risk of non-payment because even on a liquidation basis, ROK's security interest would have a loan-to-value ratio of more than 2:1. The Debtor believes itself to be worth $4,000,000 in a liquidation; ROK's secured claim would be for $1,634,589.00. Attorney Notinger also noted the Debtor has been operating on a positive cash flow basis since the start of the case and its pre-petition struggles resulted from mismanaged construction debt. On cross-examination, Attorney Notinger conceded that under the Plan, SFG can transfer the property to any entity at any time. He also briefly discussed the limited or non-existent market for financing for this hotel, and acknowledged that due to the limited market, the Debtor was unable to get a range of possible interest rates for any refinancing of debt.

The Debtor's next witness was Attar, who testified about the release of the estate's alleged contempt claim against him. Attar is the principle and manager of the Debtor. The contempt claim arose from Attar's alleged use of construction financing for personal reasons in the amount of $364,937.18. Attar believes the entire amount was expended for the benefit of the

Debtor. However, prior to the bankruptcy, he testified he begrudgingly paid $132,632.12 to the Debtor as reimbursement for the funds used, leaving $232,305.06 still in dispute. Attar vehemently opposes paying the remainder of the funds and stated he would litigate any action brought by the estate to collect the outstanding amount. He also stated he would consider pursuing a counterclaim to recover the $132,632.12 he paid back to the Debtor. Attar testified he has the funds to litigate the dispute and conceded he has the ability to pay a judgment rendered against him. Attar testified he did not encourage Debtor's counsel to provide a release in the Plan. He testified, however, that he believed the release was included to tie up the affairs of the Debtor and avoid any litigation costs that would be incurred. Finally, Attar noted he is not receiving any money from the estate and that he has lost over one million dollars on his initial investment.

After the Debtor's two witnesses concluded their testimony, ROK called Fred Roedel, III ("Roedel") to testify about the appropriate cramdown interest rate and the release of the Attar contempt claim. Roedel is the co-manger of Roedel Companies, which designs, develops and owns hotels on behalf of itself and other companies. ROK is a related company of Roedel Companies. Roedel was not qualified as an expert on hotel financing or debtor-in-possession lending. See Daubert, 509 U.S. 579. Roedel's testimony was therefore limited to his lay opinion on the appropriateness of the cramdown rate and the release of the Attar contempt claim. He testified he has significant experience in hotel financing and participated in the financing of five hotels in the past year. Based on his experience, he believes the interest rate applied to ROK's mechanic's lien should be 6.2%. Among his chief concerns is ROK's increased exposure to collateral depreciation due to a lack of creditor protections usually included with consensual loan agreements. First, he mentioned ROK does not have a mortgage on the Debtor's real property

but only a mechanic's lien, which has a lengthier foreclosure process than mortgage debt under New Hampshire law. Furthermore, he testified that in a consensual loan agreement a secured lender would demand a specific franchisee for the hotel. Roedel testified hotel brand is extremely important in assessing a hotel's value. The Debtor's franchise is part of the Hilton brand, which Roedel referred to as one of the "big three." He testified his company recently considered purchasing a hotel with very similar characteristics to the Debtor for three million dollars but decided not to, and further that the hotel brand not being one of the "big three" was a major factor in the decision not to purchase at that price. Other considerations Roedel mentioned include requirements for a specific operational manager of the hotel and holding capital expenditure and cash flow reserves. Under the Plan, SFG can transfer the property to an entity of its choice and, therefore, ROK would have no say in the management of the hotel. ROK cannot require the Debtor to hold a capital expenditure reserve even though Roedel testified a well-managed hotel should have one in order to stay competitive in the market. Finally, though the Debtor has and projects a positive cash flow, there is nothing guaranteeing future management of the Debtor would not dissipate that cash flow. With those risks in mind, Roedel came to his conclusion that the appropriate cramdown interest rate is 6.2%. Regarding the Attar settlement, Roedel stated he is not aware of any payments made by Attar that would reduce the contempt claim from $364,937.18 to $232,305.06. The remainder of his testimony addressed his views regarding the merits of the claim. After Roedel's testimony, the Court listened to final arguments and took the matter under submission.

## III. DISCUSSION

In light of the district court's decision on ROK's equitable subordination objection, the Court will address the Equitable Subordination Objection. The Court will then address whether the cramdown interest rate applied to ROK's alleged secured claim satisfies the § 1129(b) requirements and whether the Plan can be confirmed where the estate releases Attar of its contempt claim.

### A. The Equitable Subordination Objection

ROK's objection to the release of any equitable subordination claims held by the Debtor is not a barrier to confirmation because the objection has already been overruled and ROK has not established grounds as to why the release should not be approved. The Objections Order overruled ROK's objections specifically presented at oral argument that the Plan was not filed in good faith; that SFG and the Debtor improperly solicited votes before a disclosure statement was approved, and that the Plan improperly classifies creditors.

The following paragraph then provided:

The hearing on the Objection is continued to a date to be determined with respect to the following issues not overruled by this Order:

> 1. The cramdown interest rate to be applied to ROK's secured claim, if any, and
>
> 2. Whether the estate's settlement of the $232,305.06 contempt claim against Attar can be approved under the standards applicable to approval under Federal Rule of Bankruptcy Procedure 9019.

By narrowing the remaining issues in the Objection and stating "with respect to the following issues not overruled by this Order," the Court clearly overruled all other issues raised in the Objection. Assuming, arguendo, the Objections Order did not clearly overrule the Equitable Subordination Objection as well as the remaining objections, aside from a conclusory

9

paragraph in the Objection stating "[t]he Plan improperly attempts to cloud the rights of creditors to assert their own equitable subordination and other claims against Specialty Finance, SFG and Debtor and its 'officers, directors, members, affiliates, advisors' and others," ROK has not raised that issue. In fact, ROK has had ample opportunity to raise arguments regarding the Equitable Claim Objection, and any other objections, during oral arguments on January 31, 2012, its pretrial statement, Doc. No. 300, and the evidentiary hearing on July 23, 2012. ROK has not brought forward any argument as to why the release of possible equitable subordination claims is not proper use of the Debtor's business judgment. Under the standards espoused in Jeffrey v. Desmond, 70 F.3d 183 (1st Cir. 1995), the release can be approved by the Court. See infra Part C. Because of the Objection's Order and ROK's failure to prosecute any objections beyond the two specifically addressed in this Opinion, any objection raised in the Objection by ROK, excluding the cramdown interest rate and the Attar release, is hereby overruled.

### B. Cramdown Interest Rate

To a confirm a plan of reorganization, a debtor must either satisfy all of the requirements of 11 U.S.C. § 1129(a) or, where an impaired creditor rejects the plan of reorganization, satisfy the requirements of 11 U.S.C. § 1129(b). Under § 1129(b)(1), a plan can be confirmed over the objection of an impaired class of secured claims if the plan does not discriminate unfairly and is fair and equitable. A plan is fair and equitable as to a class of secured claim holders if the holders of such claims retain the liens securing such claims to the extent of the allowed amount of the claims and receives on account of such claims deferred cash payments totaling at least the allowed amount of such claims, of value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property. § 1129(b)(2)(A)(i)(I) & (II). Simply stated, a debtor can restructure a secured creditor's debt over the creditor's objection as

10

long as the creditor retains its lien and receives deferred cash payments equal to the present value of its secured claim as of the effective date of the plan.

"Present value" is the current value of a future payment, and takes into account various risks that may arise between the present and future payment date(s). To compensate the creditor, an additional rate of interest, i.e., the discount rate, is added to take into account the time value of money and the risk or uncertainty of the anticipated payments. See Till v. SCS Credit Corp., 541 U.S. 465, 474 (2004) ("A debtor's promise of future payment is worth less than an immediate payment of the same total amount because the creditor cannot use the money right away, inflation may cause the value of the dollar to decline before the debtor pays, and there is always some risk of nonpayment."); In re Pamlico Highway Dev., LLC, 468 B.R. 783, 792 (Bankr. D.S.C. 2012). The interest rate applied to the restructured debt is what ensures present value is received. In re Mayslake Village-Plainfield Campus, 441 B.R. 309, 321 (Bankr. N.D. Ill. 2010).

The appropriate interest rate used in a cramdown loan (the "cramdown interest rate") is a factual determination made on a case by case basis. In re Linda Vista Cinemas, LLC, 442 B.R. 724, 749-50 (Bankr. D. Ariz. 2010) (holding there is no one size fits all approach and rough estimates are better than no estimates). The Bankruptcy Code is silent as to which method a court should use in making this determination. Till, 541 U.S. at 473; Mayslake, 441 B.R. at 319 (noting the Code is silent on how to arrive at the accurate figure and the case law is anything but clear). The Court in Till provided some guidance for a chapter 13 case, first noting the nature of the secured creditor's pre-petition dealings with the debtor is irrelevant because the purpose of the cramdown interest rate is to adequately compensate the secured creditor for the time value of

11

their money and the risk of default. 541 U.S. at 477. In its analysis, the Court considered four different approaches to arriving at a cramdown interest rate before concluding the formula approach is the correct method. Id. at 478. The formula approach "begins by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default. Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan."[2] Id. at 479. Other courts have mentioned more specific factors such as the financial condition of the Debtor at the time of confirmation, the loan-to-value ratio, the value of the collateral, the term of the proposed loan, the debt service coverage ratio and the quality of any guarantors. See In re SW Boston Hotel Venture, LLC, 460 B.R. 38, 54-55 (Bankr. D. Mass. 2011), vacated on other grounds, No. BAP 11-087 (B.A.P. 1st Cir. Oct. 1, 2012); In re 20 Bayard Views, LLC, 445 B.R. 83, 109, 111 (Bankr. E.D.N.Y. 2011). Thus, to determine a cramdown interest rate under Till, the bankruptcy court must first conclude what the prime rate on the effective date is, then make an upward adjustment to account for any additional risks posed by the specific debtor.

---

[2] The Court noted that if it "could somehow be certain a debtor would complete his plan, the prime rate would be adequate to compensate any secured creditors forced to accept cramdown loans." Till, 541 U.S. at 479 n.18.

Though Till provided a method to determine a cramdown interest rate in chapter 13 cases, bankruptcy courts have applied its reasoning to cases under chapter 11. Most courts have adopted the two-step process outlined in Bank of Montreal v. Official Committee of Unsecured Creditors (In re American HomePatient, Inc.), 420 F.3d 559 (6th Cir. 2005). See, e.g., Bayard, 445 B.R. at 108. For chapter 11 cases, most courts "first inquire whether an efficient market exists for cramdown financing; if so, the market rate will apply. If there is no efficient market for the restructured loan, courts should follow the formula approach adopted in Till." SW Hotel, 460 B.R. at 54. When deciding whether an efficient market exists, courts look to expert evidence and evidence of actual loan offers. Id.; Bayard, 445 B.R. at 108. However, there is no requirement for a chapter 11 debtor to attempt to find exit financing before the court can determine whether an efficient market exists. SPCP Grp., LLC v. Cypress Creek Assisted Living Residence, Inc., 434 B.R. 650 (M.D. Fla. 2010).

The Till Court stated the burden of proof on any upward adjustment to the prime rate is on the creditor and that these adjustments usually range between 1-3%. 541 U.S. at 479-80.[3] Multiple cases have addressed chapter 11 plans where a debtor proposed cramdown interests between 0-2%, espousing that the risk of non-payment is low. In In re Prussia Associates, the court concluded the debtor needed to add 1.5% to the prime rate to adequately compensate the secured creditor where the value of the collateral was $23 million and the debt was approximately $19 million. 322 B.R. 572 (Bankr. E.D. Pa. 2005). The court in Prussia

---

[3] But see In re Walkabout Creek Ltd. Dividend Hous. Assoc. Ltd. P'ship, 460 B.R. 567, 575-76 (Bankr. D.D.C. 2011) (noting that "[a]lthough the Court in Till listed some factors a bankruptcy court should consider in arriving at a risk adjustment, the Court gave no explanation for how bankruptcy courts are supposed to quantify a risk adjustment after considering those factors").

Associates stated that though there were doubts to the feasability of the debtor's plan, the debtor's operations were improving and the collateral was appreciating steadily. Id. at 591. Hence, the court concluded "the risks attendant to the proposed loan [were] neither negligible nor extreme" and required the 1.5% upward adjustment. Id. The facts in In re Cantwell are most similar to those in this case. 336 B.R. 688 (Bankr. D.N.J. 2006). Plan confirmation was subject to resolution of the cramdown interest rate. A second mortgagee held a debt of $650,000 and an equity cushion of $520,000. Id. at 690. The debtor contended the prime rate was adequate for confirmation because the creditor had a large equity cushion, the debtor had to refinance within a year and was making adequate protection payments, and the stay was lifted for the creditor to continue foreclosure proceedings up to the point of judgment. Id. Though the court in Cantwell agreed the risk of nonpayment was negligible, it still proscribed a "*nominal* adjustment to the prime rate of 1%." Id. at 693 (emphasis added).

Turning to the facts of this case, the Debtor has no duty to seek exit financing and the parties agreed the Till approach should be used. Therefore, the Court will proceed with its analysis using the approach described in Till. The Court must first determine whether an efficient market exists. See Mercury Capital Corp. v. Milford Conn. Assocs, L.P., 354 B.R. 1, 12 (D. Conn. 2006) (holding there was not enough evidence in the record to determine whether an efficient market existed). Here, neither party has presented evidence of an efficient market.

Subsequent to the evidentiary hearing held by the Court, the District Court found that ROK's mechanic's lien does not take priority over SFG's mortgage to the extent of $6,434,074.40, i.e., to the extent of the amount ROK received from loan disbursements "as payment for preparing the building site, constructing the hotel, installing permanent fixtures, and

providing architectural and engineering services." 2012 DNH 148. Since the Plan provides that ROK is wholly unsecured if SFG's mortgage is ruled to be senior to its mechanic's lien, pursuant to the District Court's decision, and absent success on appeal, confirmation of the Plan will entitle ROK to receive only its pro rata share as a general unsecured creditor.

In the Plan, the Debtor is proposing to pay the alleged first priority secured claim of ROK at the prime rate of interest. Essentially, the Debtor is contending a restructured loan to the Debtor should be paid at the same rate of interest as the most creditworthy borrowers in the market. Considering the financial difficulties that result in a debtor filing for bankruptcy protection, namely difficulties paying its debts, such a position would certainly be an outlier. The Supreme Court in Till estimated a common range would be a 1-3% adjustment. 541 U.S. at 480. The Parties have not cited, and the Court has not found, any persuasive precedent supporting the use of the prime rate with no additional risk increment as the cramdown interest rate. Nonetheless, Attorney Nottinger's testimony is well taken. ROK has a considerable equity cushion based on a liquidation value that was supported by the record. See Matter of Hoskins, 102 F.3d 311, 318 (7th Cir. 1996) (noting liquidation value is normally a wholesale value).

The likelihood of ROK's collateral depreciating by 50% in the next seven years may be negligible. All parties concede the Debtor is currently operating on a positive cash flow basis and ROK has not objected to the feasibility of the Plan. While the burden of proof is on ROK to prove an upward adjustment is necessary, the Debtor proposed no adjustment at all. Accordingly, ROK merely needs to show some adjustment is necessary for confirmation of the plan to be denied.

ROK's witness testified that a rate of 6.2%, or a risk increment of 2.95% over the Debtor's proposal, was necessary because ROK was not receiving ordinary creditor protections and controls due to the non-consensual nature of cramdown debt. Roedel testified that outside of bankruptcy, ROK would be able to foreclose on the debtor's real property and would be paid in full. Due to the cramdown provision of the Bankruptcy Code, ROK is being forced to receive deferred cash payments over seven years and rely on the prospect of the Debtor being able to refinance at the end of the term to make the balloon payment. Roedel testified that in such situations, a secured creditor–particularly in the hotel industry–would want covenants with respect to the franchise brand to be used, the manager of the hotel, the owner of the property, and adequate cash flow and capital expenditure reserves. In summary, a secured creditor would demand certain conditions in a consensual loan to protect against depreciation of its collateral. Otherwise, it could institute foreclosure proceedings to recover the property. ROK has not presented any evidence its collateral will depreciate and, as stated earlier, it has a considerable equity cushion. Yet, ROK must wait seven years without any say as to the management of its collateral and hope there is enough equity at the end of the repayment term to receive financing for a balloon payment.

The Court finds ROK has not established a necessity for an incremental adjustment of 2.95%. ROK supports its increment solely on the absence of what it believes are loan terms and covenants that would protect a lender. While ROK's reasoning is sound, its evidence did not address the substantial equity cushion that ROK's contingent secured claim would have. However, some risk adjustment, if only a nominal one, seems appropriate for the risks inherent in refinancing the reorganized Debtor in seven years. In Cantwell, the risk to the creditor was

even less than in the present case. The creditor in Cantwell also had an almost 2 to 1 loan-to-value ratio. But in Cantwell, the secured creditor would be paid in full after the debtor refinanced in only one year, 336 B.R. at 690, not seven years. In Cantwell the court held an adjustment of 1% was necessary. Id. at 693. The Court holds the Plan cannot be confirmed using only the prime rate of 3.25% to cramdown ROK's alleged secured claim. The risks inherent in the reorganized Debtor's operations and refinancing in seven years requires some minimal increment over the prime rate.

### C. The Attar Release

Finally, the Court turns to ROK's objection to the Attar release. For the reasons set forth below, the Court concludes the Attar release is a valid exercise of the Debtor's business judgment.

According to ROK, the Plan releases Attar of all liability to the estate in contravention of the Bankruptcy Code. Section 1123(b)(3)(A) allows a debtor-in-possession to settle claims belonging to the debtor or to the estate in a plan of reorganization. The First Circuit has not established a standard for approval of compromises in a chapter 11 plan. In re Whispering Pine Estates, Inc., 370 B.R. 452, 461 (B.A.P. 1st Cir. 2007). The court in Whispering Pines implied the standard for compromises under Bankruptcy Rule 9019 provides guidance to settlements in a chapter 11 plan. Id. Compromises outside of chapter 11 plans are scrutinized under the factors articulated in Jeffrey v. Desmond, 70 F.3d 183 (1st Cir. 1995). The specific factors a bankruptcy court considers when making this determination include: (i) the probability of success in the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and

delay attending it; and (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premise.  Id. at 185.  However, the release in this case is to an insider, which requires stricter scrutiny.  Whispering Pines, 370 B.R. at 461.

In light of the Jeffrey factors, the Debtor has satisfied the standard for approval of a compromise.  The Debtor presented evidence which indicates the likelihood of success on the claim is no better than 50-50, and the amount of any judgment will likely be less than the full amount of the claim.  Attar admitted he could satisfy a judgment for the full claim, but he would oppose any attempt to recover the full claim amount of $232,000 and that he would strongly consider filing a counterclaim to recover the approximately $132,000 he has previously repaid to the Debtor. The plethora of litigation before the bankruptcy filing supports his testimony. Furthermore, the Debtor argues that even without likely litigation expenses, the Attar claim is not worth pursuing.  The Plan injects $150,000 into the estate from SFG.  Without SFG's contribution to the Plan, the estate has no funds.  Assume, arguendo, the Plan is denied and the Debtor or a trustee in chapter 7 pursue the Attar claim.  If $232,000 is recovered, 55% will go to SFG, because, without the Plan, SFG has not released its unsecured deficiency claim.  As a result, only approximately $127,600 would be left for other creditors, or less than SFG's contribution to the Plan.  When litigation costs, the risk of losing on the merits, and the argument the proceeds are subject to SFG's secured claim are factored in, the release of the Attar claim is in the best interests of creditors.

Finally, regarding Attar's status as an insider, his testimony that he in no way used his position as managing member of the Debtor to coerce a release of the estate's claim against him was convincing.  Attar testified that as far as he understood, the release was a strategic decision

to complete a clean break from the Debtor's past disputes.  He added that under the Plan, he receives no money from the estate and that he has been working as the managing member without compensation.

## IV.  CONCLUSION

All objections raised in the Objection by ROK but not discussed in this opinion have been overruled in the Objections Order or have not been pursued by ROK.  For the reasons set forth in this opinion, the Court concludes that (1) the Plan cannot be confirmed at the proposed cramdown interest rate, and (2) the release of the Attar contempt claim in the Plan is a reasonable exercise of the Debtor's business judgment.

This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court will issue a separate order consistent with this opinion.

ENTERED at Manchester, New Hampshire.

Date:   November 8, 2012                           /s/ J. Michael Deasy
                                                   J. Michael Deasy
                                                   Bankruptcy Judge